Court is now in session. Please be seated. This is Stephanie Hicks v. The City of Tuscaloosa. Mr. McElwain is here for the appellate. Ms. Gill for the appellee and Mr. Sherwin, Ms. Sherwin, and Mr. McElwain. It please the court. And I think I know who's going to win that game, so, but I'll save that for later. It might have something to do with someone climbing a mountain. You're affecting your credibility with the court. Jim O. Woodson from the city's legal department is also here. Steve Anderson, who is the police chief of the City of Tuscaloosa is also here. I wanted to introduce them. As you know, this case involves basically two claims, one related to the plaintiff's reassignment from the narcotics task force and our position is that she failed to show pretext with regard to the reasons why she was reassigned back to the patrol division. Tuscaloosa, unlike I'm sure South Bend and is a college town with a very bad drug problem. Why does she have to show pretext? Isn't the issue, this isn't here on summary judgment. The jury has already decided the issue is whether or not there's enough evidence in the record for the jury to infer intentional discrimination, right? She does have to show pretext. They cite a case that says that you don't have to go into that issue or go through the steps. Was that in the jury instruction? Ladies and gentlemen, you have to show pretext? You have to decide whether you believe the reasons. Yes, sir. Is the word pretext in the jury instruction? I don't have a recollection of whether it is or is not. Well, she's got, we look at the evidence in the case. She's got several overheard conversations, disparaging remarks, demeaning remarks. She's got temporal proximity only eight days after she returned to when she was reassigned. And what else? She's got evidence, she's got the conversations, and then she's got temporal proximity. Why isn't that enough to support the inference that the city's reasons were pretextual? The conversations weren't by the decision maker. The decision maker was Chief Anderson. He was trying to deal with a problem that arose out of a corrupt leader of this task force. How long was the trial? How long did the trial run? Two weeks. That was three times as long as anyone had anticipated it would last. Tina Richardson said that she would find a way to write Hicks up and get Hicks out of here. She's not a decision maker and there was nothing. There isn't any evidence in the record that she was involved whatsoever in the termination decision? Well, it wasn't a termination. I'm sorry, for her to leave. It's a constructive discharge decision. Well, that leaves out an important step. She certainly was involved at the task force level with discussing this issue. But in order for it to happen, the Chief of Police, Chief Anderson, would have to make that decision. And he met with her. He met with who? The plaintiff. He met with the plaintiff before he made the decision to hear her side of the story. He did not meet with Lieutenant Richardson at all. There's no evidence that Lieutenant Richardson in any way influenced Chief Anderson. In a traditional cat spa theory, there's just one link. It would be Richardson to Anderson. Here we've got Richardson to Robertson to Anderson. Are there any cases out there that say that makes any difference at all to have an additional link? Well, I think it's just I have not found any cases that would say it wouldn't make a difference. I think the key here is just logic. If her animus and her comments don't make their way to Chief Anderson, then how can that possibly cause any discriminatory intent to be involved in this decision? But I would add again that he met with her. The city was involved in a case many years ago called Stimson v. City of Tuscaloosa. And in that case, the Civil Service Board, after hearing from both sides, made a decision. And the court held that that broke the chain of causation. And it was based on a prior case, Lompolis, by the 11th Circuit. And there have been several cases since then where if the decision maker meets with the individual, the ultimate plaintiff, to obtain information about what has happened, and he did meet with her, and she had no excuse for why she had not taken on these informants. I need to drop back for a second and talk about the importance of that. She admitted that it was an important task for her. And I know it's easy to get caught up in this temporal proximity paradigm. But this is a situation where there wasn't a lot of time. The plaintiff was supposed to pick up the informants of another agent. Another agent who was just about to go out on pregnancy leave, FMLA leave. There's no way that this task force can do its job without informants. And what he had instructed, what the captain had instructed the plaintiff to do, and she admits this, is to take over and begin using these informants. And she admitted in her testimony that of the five or six that this other agent had, who was just about to go out, she met with one and may have talked to another one on the phone. Can I just stop you briefly? Because I think my fundamental concern here is that this was a two-week trial, and all of this stuff was told to the jury, shown to the jury, explained to the jury. And I feel like we're being asked to sort of refine facts here. We're talking a lot about who said this and who said that and what happened then and what happened then. And surely the jury heard all this stuff. And, you know, as I look at especially, you know, sort of the beginning of the argument section of the brief, between pages 17 and 20, there are, I don't know, eight or nine unpublished decisions being cited for various points of law. And I just wonder how many of those were flipping jury verdicts. I haven't done a count, but I would submit that the issue of how long the trial takes kind of reduces itself in importance when you look at the jury charge issues. And I may be a pet peeve about pattern jury instructions. I think they're good tools for judges to use. The problem is, is when you get into a case like this, where, you know, the judge says you've got to rebut the reasons, but he doesn't say each reason. He says that you focus on the city. Did the city do this or did the city do that? Instead of saying focus on the decision maker. And if you're not properly charged on that issue, the fact that there's all this stuff about Tina Richardson, Lieutenant Richardson, really is irrelevant. Because a lay jury is not going to go in and be able to decide, well, which one of these people is the city? So let me ask you this, though, about your... It seems like we may be shifting a bit to your jury instruction argument, which is fine. In the paragraph above, though, the one that you quote, your reason versus reasons argument, the court did instruct the jury, the employer may transfer, demote or discipline an employee for any other reason, good or bad, fair or unfair. If you believe the city of Tuscaloosa stated reason for the decisions regarding Stephanie Hicks' employment, and you find that the city of Tuscaloosa's decision was not motivated by and you must not second guess the city, why doesn't that sort of cure any difficulty that you find between singular reason and plural reasons? Because if we're all lawyers, we might be able to discern what the litmus test is there. But this is a lay jury. It seems like, to me, a pretty favorable instruction for your side. And I assume, again, this is the pattern. If the city can transfer, demote or discipline for any reason, good or bad, fair or unfair, full stop. That seems pretty favorable to your side. Exactly. And then the judge failed to say that the plaintiff had to rebut each of the reasons. If you look at the trial transcript, much of the time that was spent by the plaintiff was dealing with a letter that Tina Richardson wrote that the chief of police never saw. I think I'm out of time here. I'll come back for the rest. All right. Thank you, Mr. McElwain. We'll hear from Ms. Gill. May it please the court, my name is Patricia Gill and I represent Agent Stephanie Hicks. I will be focusing on the issues relating to Agent Hicks' demotion from narcotics to patrol. And my colleague, the counsel for the amici, will be handling the issues dealing with the constructive discharge and the interpretation of Young v. UPS. Agent Hicks was a good cop. She was a good mother. The city of Tuscaloosa forced her to make a decision between the two and the law said she didn't have to. This is a jury verdict for the plaintiff. The defense, in order to survive on a judgment of matter of law, for it to be granted, has to show that there was no evidence on the record to support their findings. There was sufficient evidence to support the jury's finding that the transfer from one to patrol was discriminatory. Specifically, the comment by Richardson that Agent Hicks was a stupid cunt for taking 12 weeks. The conversation between Richardson and Robertson, just after Richardson had her quarterly evaluation with Hicks, wherein Hicks noted on her paperwork, my limitations were due to my pregnancy and leave. Wherein she said, I'm going to find a way to write her up and get rid of that little bitch. Tell us how Tina Richardson was involved in the reassignment decision. Yes. Tina Richardson was very involved in the reassignment decision. Tina Richardson is the one who informed Captain Robertson of the false allegations that were contained in the write-ups over the mileage and the order that she gave in April saying she couldn't write multiple warrants for a defendant. Tina Richardson also provided Captain Robertson the false information that Agent Hicks was not working with confidential informants. Captain Robertson and in his, and the audio recordings really tell everything. Agent Hicks actually confronts both Richardson and Robertson in two separate conversations. And both of those audio recordings were submitted to the jury and the jury heard those conversations. In a conversation with Richardson, specifically, Richardson says, you know, when she's asking her why I was reassigned, Richardson says, you were changed when you came back. You know, I attributed that to mothers having postpartum or mothers having gone through depressed states. She didn't say, well, you were written up twice, you didn't work with these informants, and you didn't, you know, you lacked initiative, which were the reasons outlined in the letter, she said, because of postpartum. When Agent Hicks confronted Captain Robertson in the audio or tape recording, which was Exhibit 132, he said, you know, we all considered, we all got together, and we all considered the fact that your duties were limited when you were pregnant. We sat around, we talked about it, even the chief considered it. There's sufficient record, evidence on the record, that Richardson influenced Robertson and Robertson influenced Anderson. Now, with regards to the defendant's contention that Anderson was the decision maker and that he, excuse me, that he conducted an independent investigation, that's simply not supported by the evidence on the record, or it's sharply contrasted by other evidence on the record. Agent Hicks testified that the evidence was that Chief Anderson had already made up his mind before she even went into that meeting. Agent Hicks testified when she got there, well, he testified that, you know, he went on the recommendations of Robertson, that he always went on the recommendations of Robertson, that he had never vetoed, I don't think that's the exact, I think he said overridden Captain Robertson's recommendations in the past, and he pretty much knew when he went in there that she was going to be transferred. Agent Hicks testified as soon as she got in the room, he told her she was going to be reassigned, and immediately she started crying, started pleading for her job. So, there's sharply conflicting evidence on the record. That evidence actually supports the position that he conducted no investigation and the causal chain was not broken. The jury heard this evidence, the jury weighed the credibility of the witnesses, and the jury did make that finding. Thank you. Counsel, are you addressing the constructive discharge or your colleague? My colleague will be addressing those questions. With regards to showing each reason, the defense argues that we had to show pretext. The case law is very clear that we have to show that the discrimination was a motivating factor. Each of the cases cited by the defendant, I believe Judge Newsom brought it up, that they're all unpublished opinions, but they still don't support the fact that she had to show the McDonnell-Douglas shifting each factor test. In fact, they say that she can show discriminatory intent through direct and circumstantial evidence, and that's what the jury received was direct and circumstantial evidence of discriminatory intent. With regards to the fact that with each reason, the defendant failed to bring up that argument in the judgment of a matter of law at trial, at the close of the plaintiff's evidence, and failed to bring that same argument up at the close of his own evidence. I believe that they argued because it was brought up during the jury instructions as to what's going to be contained in the jury charge. They haven't waived that argument, but it is our position that they have waived it because they did not bring it up at the time it was supposed to be brought up. Your argument then is that McDonnell-Douglas burden shifting analysis is just a method to assist us in determining whether or not summary judgment ought to be granted, but if summary judgment is denied when the case goes to the jury, the ultimate issue is whether or not there's enough evidence to support an inference of intentional discrimination. That's correct, Judge. With regards to the mitigation of damages, the jury also heard evidence that Officer Hicks' actions were reasonable. And I think that the code section that talks about mitigation of damages and how to calculate it says that the amount that has to be subtracted is what she could have earned with reasonable diligence. I think there was plenty of evidence on the record that her actions were reasonable. She was still breastfeeding. She could not have patrolled in another position because she would have had, there's a policy in place that says she has to wear the vest. Is there any law to guide us with regard to her position that she had to turn down one job because she had this case going on? There's not law, but I think it goes to whether or not her actions were reasonable. She didn't, the evidence wasn't that she actually turned it down. The evidence was they didn't actually, they talked about it, wanted to hire her, talk to her. She said that she had this case going on, and then they didn't hire her. They weren't going to give her any vacation time. So it's a little different than her turning it down versus, you know, them not hiring her. But the evidence also shows she worked three jobs. She was working as a fitness instructor. She has no college education, but she does have certifications in fitness. Obviously, fitness classes are not all day long every day, so she worked the morning and the evening shifts of those as much as she could, as much as was available. The evidence was that she was also cleaning houses on the side to help make ends meet and that she was also a photographer for families' babies. So she was trying to do what she could to make money, to make ends meet, but it was reasonable that she could not work in another patrol position because she couldn't wear the vest while she was on patrol because she was breastfeeding. With regards to the jury instructions, you know, the argument that the judge failed to say each reason versus the reasons, they mean the exact same thing in English. The jury understands that. I believe the language in Young versus UPS, they even say the reasons. They don't say each reason. It doesn't say she had to prove one of the reasons. It says the reasons. So I think the plain language of that jury instruction is correct. It is not error. With regards to whether the judge did not include the name, what the city was decision-maker, who the decision-maker is, if he defined that in his jury instructions, he's not required to repeat it over and over again throughout the jury instructions. Jury instructions are taken as a whole. So there's no error there as well. And with regards to the request to the mitigation of damages standard, again, it's reasonable diligence. Ms. Hicks acted with reasonable diligence by working three jobs, and that, again, is not in this statement of the law. If Your Honors have no more questions, I will let my co-counsel. I have constructive discharge questions. Thank you, Ms. Gill. We'll hear from Ms. Sherwin. Thank you, Your Honor. And thank you for the ability to present to the court as amici. I'm here on behalf of 22 organizations that are committed to achieving equality for women in the workplace. And I'll be focusing on the constructive discharge questions. I'll be focusing on the constructive discharge issue and the interplay between that claim and the Supreme Court's recent decision in Young v. UPS and why under those principles enunciated in Young, the jury's verdict should stand. Just eight days after her return from maternity leave, Agent Hicks was reassigned to patrol, where she faced an impossible choice. The bulletproof vest the patrol officers are required to wear subjected her to a risk of painful infection and potential loss of her milk supply. And yet, the city had denied her the accommodation she had requested, a light-duty position, an accommodation that was routinely granted to others with medical restrictions. The jury found that this put her in a position that was untenable and that a reasonable person in her position would have no choice but to resign. And there's no basis for this court to disturb the jury's findings on that point. Under those circumstances, she had to choose between her safety and indeed possibly her life by the possibility of walking patrol without a vest or without a properly fitted vest. And on the other hand, her ability to continue breastfeeding and her health. The evidence showed that she faced a risk of infection and pain. Did Anderson made some attempts to accommodate or is that correct? There's some question as to what efforts were made. And I think the jury heard all of that evidence and determined that ultimately it was not adequate. And she was ultimately still placed in a position where a reasonable person under the circumstances would be forced, would have no choice but to resign. And that evidence included, of course, the medical testimony regarding the risks to her health, including her doctor's testimony and the testimony of the lactation consultant regarding the risk that the vest posed. The jury actually literally weighed the evidence in this case by holding the vest and feeling the weight of the vest. And that's obviously a literal weight of the evidence argument that shouldn't be disturbed on appeal. So ultimately, the accommodations that were made, giving her a quote unquote easier assignment or beat, allowing her to pump breast milk in City Hall ultimately didn't resolve her issues and she shouldn't have been placed in the position. There's no authority supporting the idea that she should have had to have given that a try, had to have tried on a vest that there was no evidence in the record showing could actually address the issues related to lactation. And indeed, Chief Anderson agreed that she would be having to go against her doctor's orders if she were to walk patrol wearing the vest. There was some notion that perhaps it could be tailored in a way that would give her the benefit of safety and still accommodate her needs. The jury heard the recordings of that conversation and I think there was some confusion as to what exactly he was proposing. Was it she should just go down and see whether there would be a different vest that might fit her? Ultimately, she determined that she went home and tried on the vest. The evidence shows that's her testimony. And she determined that it couldn't be fitted adequately in a way that would relieve the weight and the pressure that would subject her to these health risks while still protecting her body, her life, as she walked on patrol. And that a looser fit to the vest would not ultimately resolve the issues. And the jury, again, weighed that evidence and agreed with her and did not credit the testimony of Chief Anderson that that accommodation would have resolved the issues. And that, again, is a credibility determination that shouldn't be disturbed by this court. Your brief wants the court to explicitly hold that the Pregnancy Discrimination Act does prohibit discrimination based on breastfeeding, right? The court would be on very solid ground in deciding that. I think should the court decide to reach that question, every case that has decided it since the Fifth Circuit's decision in the EEOC v. Houston funding case has so held. And certainly that accords with the text of the Pregnancy Discrimination Act, which reaches medical conditions that are related to pregnancy and childbirth. The relation between lactation and pregnancy and childbirth is plain. Because lactation is a related medical condition related to pregnancy. Correct, Your Honor. And that was partly the reasoning of the Fifth Circuit. And again, every lower court that has addressed that question has reached the same conclusion. In addition, it accords with the legislative history of the Pregnancy Discrimination Act, which was enacted to overturn the Supreme Court's decision in Gilbert v. General Electric, which had rejected the notion that sex-linked conditions such as pregnancy are covered under Title VII. And the Supreme Court has since recognized that in enacting the Pregnancy Discrimination Act, the Congress intended to overrule not only the holding, but also the reasoning of the Gilbert decision and to adopt the reasoning of the dissent, which held that sex-linked conditions such as pregnancy should be considered covered. And lactation, even if it were not considered explicitly covered under the text of the Pregnancy Discrimination Act as a medical condition, is indisputably a sex-linked condition, so follows under the reasoning of the dissenters in Gilbert. So, yes, Your Honor, absolutely. You would be on very solid ground in holding that lactation is a pregnancy-related condition and is covered under the text and the reasoning of the Pregnancy Discrimination Act. If I could turn just in my remaining time to the question of Young v. United Parcel Service. Judge Wilson, you made the point earlier that ultimately the question remains and was before Young and remains under Young. Was the defendant's intent discriminatory in taking whatever adverse action in question here? Here, of course, the adverse action underlying the constructive discharge claim was the transfer to patrol coupled with the failure to accommodate Officer Hicks when she sought a light-duty assignment. And the record has undisputed evidence that this accommodation was routinely provided to other agents and officers with similar medical restrictions. Young instructs that the analysis in terms of who is an appropriate comparator under those circumstances hinges on the nature of the accommodation requested rather than the source of the restrictions or the reason for the medical restrictions. So the position that the defendant urges on this court is not in accordance with Young and flies in the face of what the court actually did in Young, which was look to employees with restrictions that stemmed from the ADA who had ADA-qualifying disabilities, restrictions that were due to having lost their driver's licenses, and employees who were injured on the job. So Young essentially boils down to a question of feasibility and fairness. Why, when so many others were accommodated, could the defendants not accommodate the plaintiff? And in this case, the jury heard evidence of others who were routinely accommodated, as well as additionally evidence that suggests that ultimately the motive was discriminatory even regardless of those comparators. The jury heard conflicting testimony from Chief Anderson as to the reasons for the denial of the accommodation. At first, he testified that he denied her light duty because no positions were available, but then he admitted that he never actually checked because he didn't believe that breastfeeding was a qualifying condition. He testified that he didn't think it was necessary because she could wear some other type of vest or a looser vest. He admitted that he didn't know whether that vest existed and that she would have to ignore her doctor's advice in order to wear it. And ultimately, again, Agent Hicks determined that this was what they could come up with. This was the accommodation that was going to be offered to her and that it would not in fact meet her medical needs and would place her at the risks that I discussed earlier. The jury's findings on that point and on her ultimate decision, again, were findings where it hinged on her credibility and the jury believed her and did not ultimately believe Chief Anderson as to the reasons that the accommodation was denied. Unless there are other questions, I will rest. Thank you. Thank you. Counsel. We'll hear from Mr. McIlwain again. Thank you. I want to finish up what I was saying about the reassignment issue. Police Chief Anderson did meet with her. There's no dispute about that. They did discuss what the problem was and she told him that she did not want to do the work with the confidential informants. She wanted to do the work that she had been given in terms of limited duty when she became pregnant earlier that year. That was given to her by Jeff Snyder, who was the corrupt commander. So, there's no issue about that. She admitted, and it's at page 157 of the record, that Chief Anderson was the one that made the decision. Sounds like a good jury argument. Well, it is. It's also a good argument for motions for judgment as a matter of law that were denied. And I would submit to you that there's a case called Torres-Scair, S-K-A-I-R, that reiterates that she's got to go through the McDonnell Douglas. And that's the test that this court applies even after a jury trial. So, let me talk about constructive discharge. The plaintiff went to her doctor, Dr. Smith, and told him that she would have to wear a very restrictive ballistic vest. And she got him to write a request that she be considered for light duty. Dr. Smith testified in the trial. He admitted he had never seen this vest. And moreover, it was admitted during the case that the vests are also worn in the narcotics task force. This was the very first time after she goes back to patrol that anyone starts talking about vests. Can I ask you a favor just in sort of focusing your presentation? Sure. We're going to talk about constructive discharge. But articulate it, if you will, in a way that specifically and directly challenges the jury verdict, right? I mean, you're asking us to overturn a jury verdict. And so any party in that position needs something very concrete to show us where no reasonable juror could have concluded. Or there is some real legal error embedded in this judgment. So rather than sort of encapsulating or recapping the evidence, point us to specific places where no reasonable juror could possibly have come to this conclusion. Well, there was no dispute in the record that Chief Anderson believed that the city's tailor could modify the standard vest to be comfortable and effective. That's undisputed in the case. That's what he believed. And of course, the issue is whether he had some, whether that was a good faith belief or not, or it could be a good faith belief. Dr. Smith, her doctor, testified that the accommodation that he was proposing was reasonable. In other words, not intolerable. She agreed to try it. And I know the council has said some things about what she said or didn't say. I would just submit, please look at the record on that. She agreed to try it. And then left without being measured or anything of that sort. And came back later in the day and resigned. Was there evidence at trial that a looser fitting vest left some exposed portions? Well, a looser fitting vest might, was the testimony. But they didn't talk about a tailored vest. And that's the key to this. He believed that she could wear a tailored vest. If she couldn't wear a tailored vest, they would go in another direction. But her option at that point was to show up to work the next day with a vest that she believed was not protecting her 100%. Well, it would actually be two days later. The meeting took place on a Friday. She was supposed to come in on Monday. But before she got her vest tailored, so that she and the chief could determine whether it would be sufficient. Why is, here we're talking about a bulletproof vest, so it implicates matters of life and death. Not just getting a back sprain from lifting a few extra pounds or some added emotional pressure. Why is even one day of showing up on a job with a vest that a jury felt was inadequate, why is that acceptable? I mean, what if this were not a vest, but a parachute? And there's evidence that the parachute was not sufficient. Why is allowing somebody to jump with that, even for one day, acceptable? Well, again, it's come back, be measured. And then after that vest is made, then and only then do you determine whether it is going to be sufficient. Very important. You're saying come back to the job that she's required to wear the vest to? Right, but I mean, the only time you wear a vest is when you go out. In other words, she would go out on patrol. She wouldn't go out on patrol until she was adequately protected. Is that your understanding of what the record showed that only when you're on patrol? Right. That's what she was talking about in her testimony is that she would be riding in a vehicle in the safest part of town during the safest time of the day. And that if she wore just a big vest, then it would cause some issues. There would be, you know, arm holes and that sort of thing. That's not talking about the tailored vest. And to your question, and it really gets to the heart of these kinds of cases. We know that courts aren't supposed to act as civil service boards and that sort of thing. Juries are not supposed to either. He's got a right, the chief does, to try to have a vest made that would be satisfactory to both sides. The plaintiff assumed the worst. Judge Wood, I'm reading from Worst versus Glynn County School District. A reasonable person is expected not to assume the worst or jump to conclusions. But Chief Anderson pretty much disregarded the medical reasoning for her being unable to wear that vest, didn't he? No, he did not. The doctor... He didn't admit that he didn't care about the medical reasoning? I don't recall any such testimony by him. He was trying to accommodate her with a vest that would work. And she agreed to give it a try. And then she didn't. She assumed the worst and said, that's not possible. It can't be done. I guess the ultimate issue is not whether or not the accommodations for her were sufficient, but whether or not her employer, through Mr. Anderson, took adverse action based on her need for breastfeeding. That's the issue for the jury. Actually, it's to determine whether what she was assigned to do would be intolerable in terms of conditions. She would not have to go out unless a vest was properly tailored to be effective and comfortable. Thank you. Thank you. And court will be in recess until 9 o'clock tomorrow morning. All right.